## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| HARLEY BLANTON, on Behalf of Himself and All Others Similarly Situated, <br><br>               Plaintiff, <br>   v. <br><br> DOMINO'S PIZZA FRANCHISING LLC, a Delaware Limited Liability Company; DOMINO'S PIZZA MASTER ISSUER LLC, a Delaware Limited Liability Company; DOMINO'S PIZZA LLC, a Michigan Limited Liability Company; and DOMINO'S PIZZA, INC., a Delaware Corporation, <br><br>            Defendants. | Case No.: <br><br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff, Harley Blanton, on behalf of himself and all others similarly situated, with knowledge as to his own actions and events, and upon information and belief as to other matters, alleges as follows:

## <u>NATURE OF THE ACTION</u>

1. This action challenges, under Section 1 of the Sherman Act, an employee no-poach and no-hiring agreement orchestrated by Defendants Domino's Pizza Franchising LLC, Domino's Pizza Master Issuer LLC, Domino's Pizza LLC, and Domino's Pizza, Inc. (together, "Defendants" or "Domino's") between and among Domino's restaurant franchisees, pursuant to which the franchisees agreed not to solicit, poach, or hire each other's employees.  Domino's orchestrated, designed, dispersed, and enforced the policy among all franchisees, at least in part, through explicit contractual agreements (and remedies for violation) in standard franchise documents.  The practice at issue reflects a naked restraint of competition and a *per se* violation of the antitrust laws.

2. Domino's calls itself the worldwide leader in pizza delivery.  It has stores in all 50 U.S. states (plus the District of Columbia and U.S. territories) and in multiple international markets.

3. According to Domino's 2018 Franchise Disclosure Document (the "FDD"), approximately 93% of its 5,646 Domino's Pizza Traditional U.S. stores are

franchise restaurants. Franchise restaurants are independently owned and operated by franchisees, who have executed a standard form franchise agreement with Domino's. Franchisees are separate and distinct legal entities from Domino's. The standard initial franchise fee is currently up to $25,000. Franchisees are responsible for other fees as well, and agree to pay to Domino's royalties of up to 5.5% of weekly sales and advertising fees equal to 4% of sales.

4.     Plaintiff and the Class are current and former employees of Domino's franchise restaurants. Plaintiff and the Class suffered reduced wages and benefits and diminished employment opportunities as a result of the unlawful contract, combination, or conspiracy alleged herein.

5.     Domino's claims to be the second largest pizza company in the world and the number one pizza delivery company in the United States. It designates a portion of its corporate website to franchising information. Domino's says it has "built its 50+ year success around its franchisees – independent business owners with a common vision and mission to be the number one pizza company in the world. Much of this success has come from our franchise business model, which is primarily an internally-based franchise system."[1] Domino's boasts an "industry-leading technology platform [that] enables online ordering, direct email marketing,

---

[1]     *See* https://biz.dominos.com/web/public/franchise (last visited Oct. 11, 2018) (Ex. 1).

cost controls and store management."[2]  Domino's claims that it has "great people and great teams working extremely hard to help [franchisees] succeed. . . . Domino's franchise owners and team members know how to win and build strong teams that outperform the competition every day."[3]

6.      But as part of the system that has made Domino's the top pizza delivery company in the United States, Domino's franchisees, at the direction of and with the assistance of Domino's itself, have together colluded to suppress the wages and employment opportunities of the restaurant-based employees who work at Domino's franchise locations throughout the United States.

7.      In particular, beginning no later than 2013, Domino's franchisees contracted, combined, and/or conspired to not solicit, poach, or hire each other's employees.  This agreement was evidenced by franchisees' written pledge in Paragraph 20.4 of their franchise agreements to not:

> directly or indirectly, solicit or employ any person who is employed by [Domino's], by any entity controlled by or affiliated with [Domino's] or by any other of our franchisees, nor will you induce or attempt to induce any of these people to leave their employment without the prior written consent of their employers.  We agree that we will not induce or attempt to induce any of your employees to leave their employment

---

[2]      *Id.*

[3]      *Id.*

with you and become employed with us or our affiliates without your consent.[4]

Every franchisee signing a franchise agreement dating back to at least 2013 made this same agreement.

8.   Each franchisee further agreed that a violation of this provision would cause irreparable harm and entitle Domino's to injunctive relief "for the protection of [Domino's] and our franchisees," with legal costs and expenses imposed on franchisees.

9.   In addition to the remedies set out above, each franchisee also agreed that violation of the no-solicit and no-hire agreement gives rise to "for cause," non-curable default of the franchise agreement and that Domino's may terminate the franchise of a franchisee who violated the provision, thus triggering forfeiture of the franchisee's initial franchise fee, along with other post-termination penalty provisions.

10.   The Domino's no-solicit and no-hire agreement is an unreasonable restraint of trade.

11.   As the Department of Justice ("DOJ") Antitrust Division and Federal Trade Commission's ("FTC") joint *Antitrust Guidance for Human Resource Professionals* (October 2016) states: "Naked wage-fixing or no-poaching

---

[4]   Domino's Pizza Franchising LLC Standard Franchise Agreement (hereafter, "FA") at ¶ 20.4.

agreements among employers, whether entered into directly or through a third party intermediary, are per se illegal under the antitrust laws."[5]  The DOJ/FTC *Guidance* elaborates:

> From an antitrust perspective, firms that compete to hire or retain employees are competitors in the employment marketplace, regardless of whether the firms make the same products or compete to provide the same services.  It is unlawful for competitors to expressly or implicitly agree not to compete with one another, even if they are motivated by a desire to reduce costs.[6]

12.     The no-poach and no-hire agreement between and among Domino's franchisees has eliminated franchisees' incentives and ability to compete for employees and has restricted employees' mobility.  This agreement has harmed employees by lowering the salaries and benefits employees otherwise would have commanded in a competitive marketplace, and has deprived employees of better job growth opportunities.

13.     The no-poach and no-hire agreement had and has the purpose of restricting competition for labor and had and has the intended and actual effect of fixing and suppressing compensation and restricting employment mobility.  The no-poaching agreement between and among Domino's franchisees is a naked restraint of trade that is *per se* unlawful under Section 1 of the Sherman Act, 15 U.S.C. §1.

---

[5]     https://www.justice.gov/atr/file/903511/download (last visited Oct. 11, 2018) (Ex. 2).

[6]     *Id.*

As the orchestrator of the unlawful agreement, Domino's bears *per se* liability therefor.

## THE PARTIES

### Plaintiff

14.   Plaintiff Harley Blanton is a resident of Port Orange, Florida.  He was employed by a Domino's franchisee-owned restaurant in Port Orange, Florida, beginning in January 2017.  Blanton was employed as a delivery driver and an in-store employee, and was trained and acted as a store morning manager.

### Defendants

15.   Defendant Domino's Pizza Franchising LLC is a Delaware limited liability company, with its principal place of business at 24 Frank Lloyd Wright Drive, Ann Arbor, Michigan. Domino's Pizza Franchising LLC is the current franchisor of Domino's Pizza franchise restaurants in the United States.

16.   Defendant Domino's Pizza Master Issuer LLC is a Delaware limited liability company, with its principal place of business at 24 Frank Lloyd Wright Drive, Ann Arbor, Michigan.  Domino's Pizza Master Issuer LLC is the direct (and sole) owner of Domino's Pizza Franchising LLC. Pursuant to a securitization transaction effective in or about April 2007, Domino's Pizza Master Issuer LLC became the franchisor under all then-existing U.S. franchise agreements.

17.     Defendant Domino's Pizza LLC is a Michigan limited liability company, with its principal place of business at 30 Frank Lloyd Wright Drive, Ann Arbor, Michigan.  Domino's Pizza LLC is the indirect parent company of Domino's Master Pizza Issuer LLC and the indirect parent company of Domino's Pizza Franchising LLC. Domino's Pizza LLC was the franchisor of Domino's Pizza franchise restaurants until the 2007 securitization transaction referred to above. After that transaction, Domino's Pizza LLC entered into a transaction or transactions with Domino's Pizza Franchising LLC, and Domino's Pizza Master Issuer LLC, pursuant to which Domino's Pizza LLC provides support and services to franchisees under their franchise agreements.  Domino's Pizza LLC also acts as Domino's Pizza Franchising LLC's sales agent and earns servicing fees for these services.

18.     Defendant Domino's Pizza, Inc., is a Delaware corporation with its principal place of business at 30 Frank Lloyd Wright Drive, Ann Arbor, Michigan. Domino's Pizza, Inc. is the indirect parent of Domino's Pizza LLC, which it wholly owns. Domino's Pizza, Inc. is the parent company, directly or indirectly, of all Domino's Pizza related entities.

19.     Domino's is in the business of selling food to customers primarily through independently owned and operated franchise restaurants.  It has multiple franchise restaurants in every state in the United States.

*Co-Conspirators*

20.     Various other corporations and persons not made defendants in this Complaint, including Domino's franchisees, participated as co-conspirators in the violations alleged and performed acts and made statements in furtherance of the violations alleged.

## JURISDICTION AND VENUE

21.     This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1 and to enjoin further violations.  The Court has subject matter jurisdiction under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, under Section 4 of the Sherman Act, 15 U.S.C. §4, and under 28 U.S.C. §§1331, 1332(d), and 1337 to prevent and restrain the Defendants from violating Section 1 of the Sherman Act, 15 U.S.C. §1.

22.     Venue is proper in this judicial district under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22, and 26, and under 28 U.S.C. §1391(b)(2), (c)(2).  Domino's has its principal place of business in this district and transacts or has transacted business in this district.  A substantial part of the events that gave rise to this action occurred in this district.

23.     Domino's is in the business of selling food to consumers, in part, through independently owned and operated franchise restaurants.  These restaurants are in each state in the United States, and Domino's has substantial business activities with each franchised restaurant, including entering into a contractual franchise agreement with the owner of the franchise.   Domino's engages in substantial activities at issue in this Complaint that are in the flow of, and substantially affect, interstate commerce.

## FACTUAL ALLEGATIONS

24.     Domino's franchisees compete with each other.   In a properly functioning and lawfully competitive labor market, Domino's franchisees would openly compete for labor, including management and other employees, by soliciting current employees of one or more other franchisees (*i.e.*, attempting to "poach" other franchisees' employees).  A properly functioning labor market would involve "cold calling": the practice by which a prospective employer freely communicates with prospective employees – even if the employee does not first express interest.

25.     For instance, if Franchise A believes that a certain manager performs her job well at Franchise B, then Franchise A would be free to contact that manager about an employment opportunity.  Conversely, if a manager employed by Franchise B perceives Franchise A to be a better organization – whether because of increased

wages, better benefits, or otherwise – then the manager would be free to communicate with Franchise A about potential employment.

26.   Poaching and cold-calling are thus important aspects of a lawfully competitive labor market. Companies perceive other rival companies' current employees, especially those who are not actively seeking other employment, in a more favorable way.  This is true, at least in part, because companies value satisfied employees who are good at their jobs, leading them to perceive a rival company's current employees as more qualified, harder working, and more stable than those candidates who are unemployed or who are actively seeking employment.  Thus, a company seeking to hire a new employee will lessen the risks associated with that hire by seeking to hire a rival's employee.  The Domino's no-poach agreement inhibits such lateral hiring of current employees because, unless Franchise B grants permission, Franchise A cannot hire Franchise B's current employee.  Franchise A can only do so once the employee has been separated from Franchise B, at which time the employee likely will be viewed by Franchise A as less valuable.  Cold-calling and poaching are thus useful and key competitive tools for companies seeking to recruit employees, particularly employees with unique skills, training, or experience.

27.   No-poaching agreements significantly impact employee compensation. For example, an employee of Franchise B will lack information regarding Franchise

A's pay packages unless cold calling and open communications are permitted; without such information, the employee lacks leverage when negotiating with Franchise B. Similarly, unconstrained by a no-poaching agreement, if an employee of Franchise B receives an offer of higher compensation from Franchise A, the employee can either accept Franchise A's offer or attempt to negotiate a pay increase with Franchise B. Either way, the employee's compensation increases.

28.     An employee of Franchise B who receives information regarding potential compensation from a rival employer will also likely inform other Franchise B employees. These Franchise B employees can then also use that information to negotiate pay increases or move to another employer – even if they do not receive a cold call.

29.     Increased mobility, combined with increased information and transparency, regarding compensation levels tends to increase compensation across all current employees in the labor market. After all, there is pressure amongst rival employers to match or exceed the highest compensation package offered by rivals in order to gain and retain skilled labor. Further, the possibility of losing talent to a rival means companies will take steps to reduce the risks of poaching by assuring that employees are not undercompensated.

30.     In a properly functioning and lawfully competitive labor market, Domino's franchisees would also openly compete for labor by hiring those qualified employees of competing franchises who seek out employment with other franchises.

31.     The beneficial effects of competition (and beneficial effects on compensation) are not, however, limited to those particular individuals who receive cold calls or who wish to speak to a rival company about an employment opportunity.  The effects instead impact all similarly situated employees because of the effect on information flow and on competition for labor.

32.     For all these reasons, the principle of free competition applies to the labor market as well as to trade.  "In terms of suppressing competition, companies agreeing not to compete for each other's employees is the same as companies agreeing not to compete for each other's customers," says Joseph Harrington, Wharton Professor of Business Economics and Public Policy, in his description of a no-poaching agreement.

33.     According to Peter Cappelli, Wharton Professor of Management and director of Wharton's Center for Human Resources, a no-poaching agreement is unfair to employees and such a pact "benefits the companies at the expense of their employees."  Mr. Cappelli notes that the reason such agreements are illegal and violate both antitrust and employment laws is because "[c]ompanies could achieve the same results by making it attractive enough for employees not to leave."

34.     The collusion of employers to refrain from hiring each other's employees restricts employee mobility.  This raises employers' power in the market at the expense of employees and diminishes employee bargaining power.  This is especially harmful to employees of Domino's franchise restaurants, as those employees are frequently paid below a living wage, and the marketable skills they acquire through their work at Domino's restaurants primarily have value only to other Domino's restaurants and do not transfer to other fast food restaurants or businesses.[7]   In addition, widespread use of no-poach agreements within the franchise industry at large effectively reduces the number of competitive employers in a market to no more than the number of franchise companies.   No-poach agreements have anti-competitive impact in labor markets analogous to that of mergers in product markets.

35.     Although unemployment in the United States is currently very low, wage growth has been slow.  A decade removed from the Great Recession, wage growth has remained stuck below 3%.[8]  A growing number of commentators have

---

[7]     In 2014, the average hourly wage of fast food employees was $9.09 or less than $19,000 per year for a full-time worker.  The poverty level of a family of four in the U.S. is $23,850.  Patrick M. Sheridan, *Low Wage, health activists prepare McDonald's attack*, CNN MONEY (May 20, 2014) http://money.cnn.com/2014/05/20/news/companies/mcdonalds-meeting (last visited Oct. 11, 2018) (Ex. 3).

[8]     *See* https://www.marketplace.org/2018/02/02/economy/here-truth-about-wages-you-won-t-hear-trump (last visited Oct. 11, 2018) (Ex. 4).

identified proliferating employer no-poaching agreements – including those used within franchise systems – and dubious employee non-compete agreements as significant contributors to this stagnant wage growth.[9]

36.     The United States DOJ has pursued and resolved civil antitrust investigations relating to no-poach agreements made between or among employers. In 2010, DOJ settlements with six high-tech employers prohibited those companies from engaging in anticompetitive no-solicitation agreements relating to their employees on a going-forward basis.

37.     As noted above, the 2016 DOJ/FTC *Antitrust Guidance for Human Resource Professionals* states:   "Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third party intermediary, are per se illegal under the antitrust laws."

38.     On November 21, 2017, United States Senators Cory Booker and Elizabeth Warren wrote to Attorney General Jeff Sessions, asking the AG to respond

---

[9]     *See*, *e.g.*, Rachel Abrams, *Why Aren't Paychecks Growing? A Burger Joint Clause Offers a Clue*, NEW YORK TIMES (Sept. 27, 2017), https://www.nytimes.com/2017/09/27/business/pay-growth-fast-food-hiring.html (last visited Oct. 11, 2018) (Ex. 5); Alan B. Krueger and Eric Posner, *Opinion: Corporate America Is Suppressing Wages For Many Workers*, NEW YORK TIMES (Feb. 28, 2018), https://www.nytimes.com/2018/02/28/opinion/corporate-america-suppressing-wages.html (last visited Oct. 11, 2018) (Ex. 6).

to questions about DOJ's approach to addressing the anti-competitive effects of proliferating no-poach agreements in the franchise context in particular.

39.     In January 2018, and at several speaking events since that time, DOJ antitrust chief and Assistant Attorney General, Makan Delrahim, disclosed that the DOJ Antitrust Division is presently pursuing a number of *criminal* cases relating to employer no-hire agreements.  As noted above, DOJ treats such agreements as, *per se*, unlawful under Section 1 of the Sherman Act.

40.     In April 2018, the DOJ announced that it had resolved an investigation into a no-poach agreement among firms in the rail industry, which – like the other matters discussed above – it labeled as *per se* unlawful.

41.     In July 2018, Attorneys General from 11 states announced an investigation into no-poaching hiring practices at a number of fast food franchise chains.  According to a release from Illinois Attorney General Lisa Madigan, the state is investigating no-poach agreements because those agreements "unfairly stop[] low-income workers from advancing and depress[] their wages."  The state AGs demanded documents and information from franchisors about their no-poach practices.

42.     In July 2018, Washington Attorney General Bob Ferguson announced that in order to avoid lawsuits, seven franchisors had reached agreements to

discontinue enforcement of no-poach provisions and to take steps to remove no-poach language from franchise agreements going forward.

43.     In August 2018, Attorney General Ferguson announced that in order to avoid lawsuits, eight more franchisors had entered into Assurances of Discontinuation relating to no-poach and no-hire agreements.  None of the foregoing agreements resolved any civil liability to franchisee employees.

44.     Domino's remains under investigation by (at least) the Washington Attorney General and has not entered into an Assurance of Discontinuance with Attorney General Ferguson.  Ferguson recently labeled Domino's "uncooperative." A Domino's spokesman told Bloomberg that it "removed" the non-solicitation provision and "released franchisees nationwide from any obligation to comply with it."  The Domino's no-poach provision as quoted in this complaint exists in the Domino's franchise agreement appended to the 2018 FDD (dated April 2018).  It also existed in every franchise agreement dating back to at least 2013.  Accordingly, even if Domino's has actually removed the provision at some time after April 2018, every Domino's franchisee to have signed a franchise agreement through at least that date has agreed to and contractually bound itself to the restraint complained of herein.

*The Domino's System*

45.    Domino's opened its first restaurant in 1960 and offered its first franchises in 1967.  It calls itself the "worldwide leader in pizza delivery."  Domino's restaurants' primary menu items are pizza, sandwiches, cheesy bread products, and other related items.

46.    As of Q1 2017, Domino's had almost 5,400 U.S. restaurant locations. According to its website, Domino's stores are more than 97% franchise-owned, with nearly 800 independent franchise owners in the U.S. Domino's Q2 2018 statistics include 5,296 domestic franchise stores and 396 Company-owned stores.  According to its website, Domino's operates 14,000 stores worldwide, in more than 85 countries.  There are more than 260,000 Domino's employees worldwide.

47.    Domino's traditional store franchise restaurants are located in shopping centers, strip centers, and similar retail locations.  Each franchisee is responsible for locating an appropriate restaurant site, which must be approved by Domino's.  The franchise is required to operate the restaurant at the specific site that Domino's approves, and may not relocate without Domino's approval.

48.    Most of the Company's franchises are subject to a standard 10-year franchise license agreement.  Franchisees who satisfy certain criteria can renew their franchises at the end of a 10-year term by signing the then-current franchise agreement.  The initial Domino's franchise fee falls within a range, which reaches

up to $25,000.  Domino's estimates the initial investment necessary to operate a traditional store as between $141,150 to $542,400.

49.    Each franchise is operated as an independently owned and managed business, by an entity that is a separate legal entity from Domino's.  Domino's licenses to franchisees the right to use the Domino's brand and system in the operation of these independently owned franchise restaurants.

50.    Like other fast food chains in the industry, Domino's restaurants maintain teams of staff in order to oversee operations and guide entry-level employees through daily responsibilities.

***Domino's Franchisees: Independent Restaurant Owners Competing with One Another***

51.    Each franchise is operated by an entity that is a separate legal entity from Domino's.  Each franchise is an independently owned and independently managed business.

52.    In executing the Domino's franchise agreement, a franchisee specifically acknowledges and represents that it is an independent business person or entity.

53.    A franchisee agrees contractually to exhibit on the store premises and on all delivery vehicles "signs of sufficient prominence and wording as we may

prescribe from time to time so as to advise the public"[10] that the store (and the vehicle) is owned, operated, and maintained by the franchisee (or the vehicle owner) rather than by Domino's. Similar requirements apply to business cards, letterheads, and other business materials and advertisements.

54.     The "Careers at Domino's" section of Domino's website notifies visitors that "Most Domino's stores are owned and operated by independent franchisees rather than Domino's Pizza LLC. Each franchisee is a separate and distinct company from Domino's Pizza LLC."[11]

55.     Franchisees are responsible for day-to-day operations, including employment matters. Each franchisee specifically agrees that it is "solely responsible for recruiting, hiring, training, scheduling for work, supervising and paying the persons who work in the Store and those persons shall be your employees, and not [Domino's] agents or employees."[12] Franchisees must secure and maintain all required business licenses, permits, and certificates to operate the store in compliance with applicable laws, ordinances, and regulations.

---

[10]     *See* FA at ¶ 15.8.

[11]     *See* https://jobs.dominos.com/dominos-careers/ (last visited Oct. 11, 2018) (Ex. 7).

[12]     *See* FA at ¶ 15.6.

56.     The Domino's FDD likewise informs prospective franchisees that they are "solely responsible for making hiring and other employment decisions"[13] for their stores.  The FDD also informs prospective franchisees that they must accept and process applications for store-level positions through a common online platform (for which franchisees must pay), though it purports to make franchisees responsible for "ensuring your compliance with applicable laws, rules, regulations, and ordinances."[14]

57.     The "Careers at Domino's" section of the website states that:

> All hiring and other employment decisions in a franchise store are made solely by the franchisee and not Domino's Pizza LLC, and individuals hired into a franchise store are employees of the franchisee and not Domino's Pizza LLC.  The specific store operations, work environments, and terms and conditions of employment (including but not limited to hours, pay, and benefits) can vary by store and franchisee. Domino's Pizza LLC makes no warranties or representations, and undertakes no obligations, related to the operation or management of a franchise store or any hiring or other employment decisions made by a franchisee.  Any questions related to employment in a franchise store should be directed to the franchisee.  Domino's Pizza LLC cannot and does not guarantee employment to any individuals.[15]

58.     Domino's and franchisees agree by contract – *i.e.*, in the franchise agreement – that they operate as independent contractors as to each other.  The franchise agreement specifies that franchisees and Domino's do not have a fiduciary

---

[13]     FDD Item 8.

[14]     *Id*.

[15]     *See* Ex. 7.

relationship, nor a principal-agent relationship.  Franchisees agree that they have no authority to act for or on behalf of Domino's, or to contractually bind Domino's to any agreement.  Neither franchisees nor Domino's has authority to assume liability for the acts of the other or to alter the legal relationships of the other.

59.    Domino's franchise restaurants compete with each other.  In the FDD, Domino's tells prospective franchisees that their costs "will depend on the following factors: how much you follow our methods and procedures; your management skill, experience, and business acumen; local economic conditions, the local market for your products and services; the prevailing wage rate; competition; and the sales level reached during the initial period."[16]

60.    The traditional Domino's franchise is for a single restaurant at a specified location.  The FDD informs prospective franchisees "You will not receive an exclusive territory under our Traditional Store Franchise Agreement.  You may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control."[17]   The FDD, moreover, confirms that Domino's retains the right to "define the parameters of the delivery and service area in accordance with our policy. . . .  [Domino's] has the right, in [its] sole discretion to adjust the size of [the franchisee's] delivery and

---

[16]      FDD Item 7.

[17]      *Id*. at Item 12.

service area to account for changes in market conditions, population changes or other considerations."[18]

### The Agreement Not to Compete for Management Employees

61.     Notwithstanding that each franchise is an independently owned and operated business that competes with other franchises, and notwithstanding that each (ostensibly) is "solely responsible" for its own employment decisions, including recruiting and hiring, Domino's franchisees have agreed not to compete with each other with respect to employee hiring.   This agreement is evidenced by and memorialized in explicit contractual terms contained in franchisees' Domino's franchise agreements.

62.     In particular, each franchisee who signed a new (or renewed) franchise agreement on a date beginning at least as far back as January 2013 and continuing to at least April 2018 agreed not to "directly or indirectly . . . solicit or employ any person who is employed by [Domino's], by any entity controlled by or affiliated with [Domino's] or by any other of our franchisees, nor will you induce or attempt to induce any of these people to leave their employment without the prior written consent of their employers."[19]   Domino's itself "agree[d] that we will not induce or attempt to induce any of [a franchisee's] employees to leave their employment with

---

[18]     *Id.*

[19]     *See* FA at ¶ 20.4.

[the franchisee] and become employed with us or our affiliates without your consent."[20]

63.     Each of these Domino's franchisees further expressly agreed by contract that violations of the no-poach and no-hire agreement give rise to "irreparable injury and injunctive relief" rights.  Franchisees agreed that damages alone were inadequate compensation for violation, that Domino's "will suffer irreparable harm arising out of any such violation and that injunctive relief against [the violating franchisee and its] owners is essential for the protection of us and our franchisees."[21]

64.     Franchisee owners must execute a personal covenant appended to the franchise agreement, pursuant to which they agree to be personally bound by certain of the covenants contained in the franchise agreement.  This specifically includes the no-poach and no-hiring covenants.

65.     Franchisees also agree to onerous penalties for any violation of the no-poach pact.  The Domino's FDD warns prospective franchisees that a violation of the no-poach agreement constitutes a non-curable default of the franchise agreement and is grounds for termination of the franchise.  The franchise agreement itself confirms that Domino's may immediately terminate the franchise if the franchisee,

---

[20]     *Id*.

[21]     *See* FA at ¶ 20.10.

23

or any of its owners, violate the no-solicit and no-hire agreement. Franchisees further agree that a violation of the no-solicit and no-hire pact is a basis for Domino's to refuse to renew the franchise at the end of its term. A violation of the no-poach agreement thus risks the franchisee's entire investment in the business.

66.    Franchise termination carries additional risks. In executing their franchise agreements, franchisees further covenant that for a period of one year after termination of a franchise, neither the franchisee nor its owners will "own, engage in, be employed by . . . or have any other interest, whether financial or otherwise, in any carry-out or delivery pizza store business located at the premises of the Store or within ten (10) miles of the premises of the Store . . . ."[22] Franchisees further agree that for the same period of time they will not solicit or employ any person employed by Domino's or by another franchisee, or induce or attempt to induce any such person to leave their employment without the prior written consent of their employers.

67.    Domino's discloses in its FDD that it has pursued and prevailed against a former franchisee for violation of post-termination covenants in the operation of a competing business at a former franchise location.

---

[22]    *See* FA at ¶ 20.2.

68.     Finally, franchisees agree that in the event of "any legal or equitable action" to enforce the terms of the franchise agreement, Domino's is entitled to recover from the franchisee – in addition to any judgment it might win – attorneys' fees, court costs, and expenses of litigation, irrespective of whether it prevails.

69.     Violations of the no-poach agreement thus subject a franchisee to injunctive relief, termination of the franchise, legal fees and expenses, and the damage of a covenant to not compete against Domino's or to solicit or hire Domino's or Domino's franchisees' employees, even after termination.

70.     Domino's franchises, like other franchises, are made available on standardized terms.  So a franchisee who enters into a Domino's franchise agreement knows that the same terms it has agreed to also apply to other franchisees.

71.     One of the standard terms in Domino's franchise agreements with all its franchisees, signing agreements at least until April 2018, is the no-poach provision referred to above.  Franchisees thus reasonably know that all other franchisees have agreed to the same no-poach and no-hire agreement.

72.     Even if some franchisees signed a different franchise agreement after April 2018, there were, as of December 31, 2016, almost 5,000 franchises already in existence and operating under older versions of the franchise agreement that contained the no-poach and no-hire restraint.

73.    The Domino's franchise agreement contains an integration clause. Franchisees specifically contract that the franchise agreement may not be modified, amended, or changed except by a writing signed by all parties.

74.    The Domino's FDD includes a list of all Domino's franchisees, organized by state, city, and street address.  Franchisees thus know that these entities are the other franchisees as to whom the no-poach agreement memorialized in the franchise agreement applies.

75.    The no-poach and no-hire agreement among Domino's franchisees is short-sighted and ultimately not in the franchisees' independent interest, even though it is in the interest of the conspirators as a whole when acting together.

76.    The no-poach and no-hire agreement does not serve the interests of ensuring that Domino's restaurants produce a quality product.

77.    The no-poach and no-hire agreement does not serve fast-food customers because it does not incentivize Domino's franchisees to invest in training workers to improve Domino's food, experience, and service.

78.    Consumers can gain from competition among employers because a more competitive workforce may create more or better goods and services.  Further, unemployment is at record lows, yet wage growth has remained sluggish.  Fast-food workers regularly rely on public assistance to supplement their income.  Higher wages would lessen the strain on public assistance, benefiting all consumers.

79.     The no-poach and no-hire agreement is not in the independent interest of Domino's franchisees if acting unilaterally.  Employees are critical to the success of Domino's franchises.  A significant component of making the franchise profitable is hiring qualified, motivated, and superior employees.  Therefore, it is in the independent interest of each Domino's franchisee to compete for the most talented and experienced restaurant employees.

80.     By adhering to the no-poach and no-hire agreement, franchisees artificially restrict their own ability to hire employees in a manner that is inconsistent with their own unilateral economic interests.  By acting in concert, however, they also protect themselves from having their own employees poached by other franchises that see additional value in those employees, such as their training, experience, and/or work ethic.  This allows franchisees to retain their best employees without having to pay market wages to these employees or compete in the market place relative to working conditions and promotion opportunities.

81.     Most importantly, the no-poach and no-hire agreement does not serve franchisee employees because it does not incentivize franchisees to invest in higher wages, benefits, and improved working conditions, *i.e.*, to compete for their labor.  It also dis-incentivizes employees to perform their best work as those efforts are not rewarded commensurately.  Competition among employers helps actual and

potential employees through higher wages, better benefits, or other terms of employment.

82.     Domino's franchisees have a shared interest, however, in keeping labor costs low.   As noted above, franchisees pay to Domino's royalties based on a percentage of gross sales.   Cost of labor therefore has a direct impact on franchisee profitability.   By agreeing to not compete for labor, they act against their unilateral self-interest, but serve their shared interest.

83.     But for the no-poach agreement, each Domino's franchise is its own economic decision-maker with respect to hiring, firing, staffing, promotions and employee wages.   But for the no-poach agreement, each Domino's franchise would compete with each other for the best-performing employees.

***Other Evidence of Domino's System-Wide Commitment to Suppressing Employee Wages and Mobility and of the Unlawful Agreement***

84.     Low wages are consistent, even if not uniform, across the Domino's system.   This has allowed Domino's owners and executives, and Domino's franchisees, to become wealthy while full-time, hardworking employees often must resort to government benefits just to put food on their own tables.   A significant reason for this is that Domino's has orchestrated an agreement among franchisees to stifle employee wages and mobility.

85.     The average fast-food worker in the United States makes approximately $19,900 per year, while the average fast-food CEO earns $1.2 million per year.

86.     If franchisees had to either pay and promote good employees, or lose them to competitor locations, they would be forced to pay competitive wages and provide competitive promotion opportunities.   However, because of the no-hire agreement, and because the education, training, and experience within the Domino's system are unique to Domino's and not transferrable to other restaurants, Domino's franchisees do not have to compete with other Domino's franchisees, and do not have to compete with non-Domino's businesses for their employees except at the entry-level position.

87.     Hart Research Associates surveyed 1,088 fast food workers in 10 major metro areas, and found that 89% of fast food workers have experienced wage-theft, in multiple forms, at their fast food job.   Wage theft occurred through forcing employees to work off the clock, not paying workers for all hours worked, denying breaks, and failing to pay for overtime.[23]

88.     From 2007 to 2011, fast food workers in the U.S. drew an average of $7 billion of public assistance annually because of low wages.

89.     Domino's is a member of the American Pizza Community (the "APC"), a powerful arm of the food industry lobby specifically speaking for "Big Pizza."   The APC coalition was founded in 2010 and includes many of the nation's other largest

---

[23]   *See* Hart Research Survey, http://big.assets.huffingtonpost.com/NationalWageTheftPollMemo.pdf (last visited Oct. 11, 2018) (Ex. 8).

pizza retailer chains, including Little Caesar, Papa John's, and Pizza Hut – each of which, like Domino's, is a franchisor. Among other causes, the APC has been an active critic of the Department of Labor's final ruling on overtime eligibility in 2016. That ruling doubled the overtime salary threshold from $23,660 to $47,476, guaranteeing overtime pay for millions of additional workers. The APC previously opposed a minimum wage hike in California and lists labor employment policies as among the top issues on its website.

90.     Domino's and its franchisees are well-versed in no-poaching efforts as they regularly employ highly restrictive "non-compete" agreements binding the franchise owners. Pursuant to the franchise agreement, both during and after the franchise term, Domino's franchisees are contractually prohibited from engaging indirectly or directly in any other carry-out or delivery pizza store business.

91.     In addition to their shared motivation to enforce the no-hire agreement, and their actual understanding of the no-hire agreement, Domino's franchisees also have abundant opportunity to communicate about and coordinate their no-hire agreement. Domino's holds regular or annual business conferences or conventions, at which franchisees have an opportunity to meet and discuss their no-poaching scheme. Domino's franchisees also take part in the Domino's Franchisee Association and/or the Domino's Franchisee Forum. The Domino's Franchisee

Association holds its own regular or annual national meeting, where franchisees discuss issues including recruitment and staffing.

***Employment with Non-Domino's Brands Is Not a Reasonable Substitute for Domino's Employees***

92.    Training, education, and experience within the Domino's system are not transferrable to other restaurants for a number of reasons.

93.    The Domino's FDD informs prospective franchisees that they must use the management system and computer hardware and software and related technology designated by Domino's, including for such issues as online ordering.  Domino's specifies an online platform to be used by franchisees for hiring and employment decisions.  The franchise agreement requires that franchisees use "specially designed equipment, computer hardware and software designed by us, and specifications for the preparation and sale of pizza and certain authorized food products."[24] Experience with this equipment and these specifications is of little value outside the Domino's system.

94.    Franchisees are required to utilize the proprietary Domino's PULSE system, which functions as a point of sale computer system with employee time clock, scheduling, cost management and reporting, with payroll and commercial

---

[24]    *See* FA at ¶ 1.

accounting interface.  Experience with these systems is of little value to other brand restaurants.

95.     Franchisees use approved or mandatory suppliers and vendors specified by Domino's.  Experience with these vendors is of little value to other restaurants.

96.     Franchisees also utilize proprietary store operating procedures, described in copyright-protected Operating Manuals, Training Manuals, videotapes and related materials, and certain proprietary software.   These materials are proprietary and confidential.

97.     A no-poach and no-hire agreement like the agreement among Domino's franchisees reduces employees' outside options and lowers their quit rate, thereby increasing the share of net-returns captured by employers.  Further, a franchise-wide no-hire agreement increases the specificity of human capital investment, as training that is productive throughout the franchise chain can be used only by a single franchisee pursuant to the agreement.

## REPRESENTATIVE PLAINTIFF ALLEGATIONS AND ANTITRUST INJURY

98.     Plaintiff, Harley Blanton, began working at a franchisee-owned Domino's restaurant at 1820 Dunlawton Avenue in Port Orange, Florida in or about January 2017.  At all relevant times, Blanton was an at-will employee, paid on an hourly basis or at an annual salary rate.

99.     Blanton started as an in-store employee and delivery driver, at a rate of $8.25 per hour in-store and $5 per hour for delivery work.

100.    Blanton quickly received training to work as a store morning manager, the duties of which included, among other things, opening the store, having access to put money in the safe (and cash register), and access to employee check-in and check-out on the computer system. Blanton was told by his manager that he would receive an increase in his hourly rate with these duties, but he never did receive an increase.

101.    Blanton quit his job at the Domino's restaurant in April or May 2017, after it repeatedly cut back his hours.

102.    Because Blanton was unable to transfer to a competing Domino's franchise restaurant, his only options were to stay at the Dunlawton Avenue store, or quit and start over at an entry job and wage in another setting.

103.    The no-poach and no-hire agreement among Domino's franchisees suppressed Plaintiff's wages, inhibited his employment mobility, and lessened his professional work opportunities.

*Antitrust Injury*

104.    Plaintiff suffered reduced wages, reduced employment benefits, loss of professional growth opportunities, and worsened working conditions because of the

express restraint of trade among Domino's franchisees, as orchestrated by Domino's itself.

105.   Suppressed wages and employment benefits resulting from employers' agreement not to compete with each other in the labor market is injury of the type the antitrust laws were intended to prevent and flows from that which makes the no-poach and no-hire agreement unlawful.

106.   Indeed, the no-poach and no-hire agreement embodies norms that are widely accepted across the fast-food industry and familiar to franchisees.   In advising new restaurant owners on how to hire their first general manager, one industry expert instructs that, "you have to be careful that you do not earn a reputation for stealing other people's employees."

107.   The potential for broader collusion in franchise chains is enhanced when no-poach agreements are in place.  Collusion is promoted when the no-poach agreements can be easily generated and monitored amongst a concentrated group of competitors who all stand to gain profits from the collusion while maintaining similar costs.

108.   The Domino's franchisees' no-hire agreement significantly restricts employment opportunities for low-wage workers at all Domino's restaurants, including those who have not sought employment with a competitor franchise and

those who have not been contacted by a competitor franchise.  Such a restriction causes a wider effect upon all Domino's restaurant employees.

109.   Plaintiff was a victim of the no-poach and no-hire agreement.  By adhering to that agreement, otherwise independently owned and operated competitor businesses suppressed wages and stifled labor market competition for improved employment opportunities.

**CLASS ALLEGATIONS**

110.   Plaintiff brings this action on behalf of himself, and on behalf of a nationwide class pursuant to Federal Rules of Civil Procedure, Rules 23(a), 23(b)(2), and/or 23(b)(3).

> All persons in the United States who are current or former employees at all franchisee-operated Domino's restaurants.

111.   Excluded from the Class are Defendants, their affiliates, officers and directors, and the Court.  Plaintiff reserves the right to modify, change, or expand the Class definition on discovery and further investigation.

112.   Numerosity:  Upon information and belief, the Class is so numerous that joinder of all members is impractical; there are thousands of Domino's restaurants in the U.S.  While the exact number and identities of the individual Members of the Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiff only through the discovery

process, Plaintiff believes, and on that basis alleges, that thousands of Class Members are the subjects of the Class.

113. Existence and Predominance of Common Questions of Fact and Law: Common questions of fact and law exist as to all members of the Class. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to, whether:

     a. defendants orchestrated and engaged in unlawful contracts, combinations, and/or conspiracies in restraint of trade and commerce;

     b. defendants violated the Sherman Antitrust Act, 15 U.S.C. §§1, *et seq.*;

     c. defendants should be required to disclose the existence of such agreements, contracts, combinations, and/or conspiracies;

     d. Plaintiff and Class members are entitled to damages, restitution, disgorgement, equitable relief, and/or other relief; and

     e. the amount and nature of such relief to be awarded to Plaintiff and the Class.

114. Typicality: All of Plaintiff's claims are typical of the claims of the Class inasmuch as Plaintiff was a Domino's franchisee restaurant employee and each member of the Class either was or is a Domino's franchisee restaurant employee subject to the same agreements and rules as Plaintiff. Further, Plaintiff and all the

members of the Class sustained the same monetary and economic injuries of being subjected to artificial suppression of compensation, wages, benefits, and growth opportunity, and the remedy sought for each is the same in which Plaintiff seeks relief against Defendants for himself and all Class members.

115.   Adequacy: Plaintiff is an adequate representative because his interests do not conflict with the interests of the Class that he seeks to represent, he has retained counsel competent and highly experienced in complex class action litigation, and he intends to prosecute this action vigorously.  The interest of the Class will be fairly and adequately protected by Plaintiff and his counsel.

116.   Superiority:  A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and members of the Class. The injuries suffered by each individual Class member are relatively small in comparison to the burden and expense of the individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct.  It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them.  Even if the members of the Class could afford such individual litigation, the court system could not.  Individualized litigation presents a potential for inconsistent or contradictory judgments.  Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case.  By contrast, the class action device presents far

fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.   Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendants' employment records and franchisees' records.

117.  Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## FRAUDULENT CONCEALMENT

118.  Plaintiff and Class members had neither actual nor constructive knowledge of the unlawful no-poach and no-hiring conspiracy orchestrated by Defendants, nor would any reasonable amount of diligence by Plaintiff or the Class have put them on notice of the conspiracy.  Any statute of limitations is therefore tolled by Defendants' intentional concealment of their no-poach and no-hire agreement.  Plaintiff and Class members were deceived regarding Defendants' collusion to suppress wages and employment mobility and could not reasonably discover the Defendants' anticompetitive conduct.

119.  Neither Defendants nor franchisees disclosed the existence of the no-poach and no-hire conspiracy to Plaintiff or Class members.

120.  Domino's public statements conceal the fact that it orchestrated and engaged in a no-poach and no-hire conspiracy among franchisees.

121.   The "Careers at Domino's" section of Domino's corporate website directs prospective employees to the particular job openings available at specific franchise and store locations in the geographic area selected by a prospective employee, suggesting that those locations are individually responsible for all hiring decisions and employment policies.

122.   Indeed, as noted above, the legend at the bottom of each page in this same section of the website states that:

> All hiring and other employment decisions in a franchise store are made solely by the franchisee and not Domino's Pizza LLC, and individuals hired into a franchise store are employees of the franchisee and not Domino's Pizza LLC.   The specific store operations, work environments, and terms and conditions of employment (including but not limited to hours, pay, and benefits) can vary by store and franchisee. Domino's Pizza LLC makes no warranties or representations, and undertakes no obligations, related to the operation or management of a franchise store or any hiring or other employment decisions made by a franchisee.   Any questions related to employment in a franchise store should be directed to the franchisee.   Domino's Pizza LLC cannot and does not guarantee employment to any individuals.[25]

123.   These statements highlight the supposed independence of franchisee-employers and conceal the existence of the collusive no-poach agreement.

124.   Domino's also tells employees and prospective employees that employees can advance through its system: "Many of our corporate and franchise store team members have made the leap from entry-level to business owners.  Others

---

[25]      *See* Ex. 7.

have pursued leadership opportunities throughout the brand.  For those with their sights set on becoming managers, a store role can offer the chance to hone their skills in customer service, inventory management and people development."[26]

125.   On or about February 20, 2018, Domino's filed its 2017 Form 10-K (hereafter "Annual Report") with the Securities and Exchange Commission.  The Domino's 2017 Annual Report includes a section under the heading "Our Ideals." In that section, Domino's asserts:

> We believe in: opportunity, hard work, inspired solutions, winning together, embracing community and uncommon honesty.
>
> Opportunity abounds at Domino's. You can start in an entry-level position and become a store owner – in fact, significantly all of our independent domestic franchise owners started their careers with us as delivery drivers or in other in-store positions.  Thousands of other team members – supervisors, trainers, quality auditors, international business consultants, marketers and executives – also began their careers in the stores.  Internal growth and providing opportunities for anyone willing to work hard is the foundation of our core beliefs.

126.   Domino's 2016 Form 10-K contains substantially the same language.

127.   These statements conceal the existence of Domino's unlawful no-poach agreement.   The no-poach agreement in fact stifles internal growth and stifles opportunities for employees at Domino's stores.  In not disclosing the existence of that illicit agreement to franchisee employees, Dominos failed its purported "ideals" and "core beliefs" of opportunity, winning together, embracing community, and

---

[26]      *Id*.

uncommon honesty.  Beyond failing these "ideals," Domino's concealed the truth from employees and the public.  This is another reason employees would have no reason to have known about the Domino's no-poach agreement.

128.   Further misleading are statements such as "It takes a team to make it all work smoothly, from the delivery experts and customer service representatives who handle orders, make pizza and interact with customers to team leaders and managers who run the store.  And while there may be many different roles within a store, everyone on the team pitches in and helps out with whatever is needed.  Teamwork – it's how we roll."[27]  Domino's tells prospective employees that they should join "because we're a rock solid brand" and they should stay "because you're part of the foundation."[28]  It touts that "corporate and franchise store team members make up the engine that drives a quality product."[29]  These actions also conceal the existence of the collusive no-poach agreement.

129.   Plaintiff and the Class would thus have no reason to know of the no-poach and no-hire agreements evidenced by franchisees' contractual undertakings with Defendants.  Plaintiff and the Class are not parties to franchisees' contractual

---

[27]   *Id.*

[28]   *Id*.

[29]   *Id*.

franchise agreements with Defendants. Nor are these contracts routinely provided to employees.

130.   Although Defendants provided their form franchise documents to some (but not all) state regulators, franchise disclosure documents and form franchise agreements are made available by Defendants only upon request by prospective franchisees.

131.   Defendants' franchise disclosure documents and form franchise agreements are not routinely provided to employees (or prospective employees) of franchisees, whether by Defendants, by franchisee employers, by regulators, or by anyone else.   Historic franchise disclosure documents and form franchise agreements would never be available to franchisee employees or prospective employees.

132.   Because of Defendants' successful deceptions and other concealment efforts described herein, Plaintiff and Class members had no reason to know Defendants had conspired to suppress compensation or employee mobility.

133.   As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to the claims that Plaintiff and the Class members have as a result of the anticompetitive and unlawful conduct alleged herein.

## CLAIM FOR RELIEF

## COUNT I: VIOLATIONS OF SECTION 1 OF THE
## SHERMAN ACT, 15 U.S.C. §1, *et seq*.

134.   Plaintiff, on behalf of himself and all others similarly situated, re-alleges and incorporates by reference the allegations contained in the preceding and succeeding paragraphs of this Complaint, and further alleges against Defendants as follows:

135.   Beginning no later than 2013, Defendants orchestrated, entered into, and engaged in unlawful contracts, combinations in the form of trust or otherwise, and/or conspiracies in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §1, *et seq*.

136.   Defendants engaged in predatory and anticompetitive behavior by orchestrating an agreement to restrict competition among Domino's franchisees, which unfairly suppressed management employee wages, and unreasonably restrained trade.

137.   Defendants' conduct included concerted efforts, actions and undertakings among the Defendants and franchise owners with the intent, purpose, and effect of: (a) artificially suppressing the compensation of Plaintiff and Class Members; (b) eliminating competition among franchise owners for skilled labor; and (c) restraining management employees' ability to secure better compensation, advancement, benefits, and working conditions.

138.    Defendants perpetrated the scheme with the specific intent of lowering costs to the benefit of Defendants and franchise owners.

139.    Defendants' conduct in furtherance of the no-poach and no-hire agreement were authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' affairs.

140.    Plaintiff and Class members have received lower compensation from Domino's franchise businesses than they otherwise would have received in the absence of Defendants' unlawful conduct and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

141.    Defendants' contracts, combinations, and/or conspiracies are *per se* violations of Section 1 of the Sherman Act.

142.    In the alternative, Defendants are liable under a "quick look" analysis where an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on employees and labor.

143.    Defendants' contracts, combinations, and/or conspiracies have had a substantial effect on interstate commerce.

144.    As a direct and proximate result of Defendants' contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class members have

suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

145.   Plaintiff and the Class members are entitled to treble damages, attorneys' fees, reasonable expenses, costs of suit, and, pursuant to 15 U.S.C. §26, injunctive relief, for the violations of the Sherman Act and the threatened continuing violations alleged herein.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, on behalf of himself and members of the Class, requests that this Court:

A.   Determine that the claims alleged herein may be maintained as a Class Action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B.   Appoint Plaintiff as the representative of the Class and his counsel as Class Counsel;

C.   Declare that Defendants' actions as set forth in this Complaint violate the law;

D.   Award Plaintiff and the Class damages in an amount according to proof against Defendants for Defendants' violations of 15 U.S.C. §1, to be trebled in accordance with those laws;

E.      Award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiff and the Class members are entitled;

F.      Grant a permanent injunction enjoining Defendants from enforcing or adhering to any existing agreement that unreasonably restricts competition as described herein;

G.      Declare Defendants be permanently enjoined and restrained from establishing any similar agreement unreasonably restricting competition for management employees except as prescribed by this Court;

H.      Declare Defendants to be financially responsible for the costs and expenses of a Court-approved notice program by mail, broadcast media, and publication designed to give immediate notification to Class members;

I.      Award pre-judgment and post-judgment interest on such monetary relief;

J.      Award reasonable attorneys' fees and costs; and

K.      Grant such further relief that this Court deems appropriate.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated:  October 15, 2018              **THE MILLER LAW FIRM, P.C.**

                                      */s/ E. Powell Miller*
                                      E. Powell Miller (P39487)

Sharon S. Almonrode (P33938)
Dennis A. Lienhardt (P81118)
950 W. University Dr., Suite 300
Rochester, Michigan  48307
Tel: 248-841-2200
epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com

Derek Y. Brandt
**McCUNE WRIGHT AREVALO, LLP**
100 North Main Street, Suite 11
Edwardsville, Illinois 62025
Tel: 618-307-6116
dyb@mccunewright.com

Richard D. McCune
Michele M. Vercoski
**McCUNE WRIGHT AREVALO, LLP**
3281 East Guasti Road, Suite 100
Ontario, California 91761
Tel: 909-557-1250
rdm@mccunewright.com
mmv@mccunewright.com

Walter W. Noss
Stephanie A. Hackett
Sean C. Russell
**SCOTT+SCOTT ATTORNEYS AT LAW
LLP**
600 West Broadway, Suite 3300
San Diego, California 92101
Tel: 619-233-4565
wnoss@scott-scott.com
shackett@scott-scott.com
sean.russell@scott-scott.com

Michelle E. Conston
**SCOTT+SCOTT ATTORNEYS AT LAW
LLP**

The Helmsley Building
230 Park Avenue, 17th Floor
New York, New York 10169
Tel: 212-223-6444
mconston@scott-scott.com

*Counsel for Plaintiff and the Class*