# EXHIBIT 5

# The New York Times

# Why Aren't Paychecks Growing? A Burger-Joint Clause Offers a Clue

By **Rachel Abrams**

Sept. 27, 2017

ORLANDO, Fla. — The American fast food industry is built on two pillars: cheap hamburgers, and cheap labor.

As economists try to understand why wages have stagnated across the country's economy, they are examining the cheap labor part of the equation closely. A few have zeroed in on an obscure clause buried in many fast-food franchise agreements as a possible contributor to the problem.

Some of fast-food's biggest names, including Burger King, Carl's Jr., Pizza Hut and, until recently, McDonald's, prohibited franchisees from hiring workers away from one another, preventing, for example, one Pizza Hut from hiring employees from another.

The restrictions do not appear in a contract that employees sign, or even see. They are typically included in a paragraph buried in lengthy contracts that owners of fast-food outlets sign with corporate headquarters.

Yet the provisions can keep employees tied to one spot, unable to switch jobs or negotiate higher pay. A lack of worker mobility has long been viewed as contributing to wage stagnation because switching jobs is one of the most reliable ways to get a raise.

Defenders of the practice argue that the restaurants spend time and money training workers and want to protect their investment. But two lawsuits, filed this year against McDonald's and Carl's Jr.'s parent company, CKE Restaurants Holdings, contend that such no-hire rules violate antitrust and labor laws.

McDonald's said its policies did not violate any laws. The company recently removed the language from its contract, and declined to say whether the lawsuits had played a role in

Case 2:18-cv-13207-VAR-DRG   ECF No. 1-6, PageID.78   Filed 10/15/18   Page 3 of 9

that decision. CKE declined to comment.

The no-hire rules affect more than 70,000 restaurants — or more than a quarter of the fast-food outlets in the United States — according to Alan B. Krueger, an economist at Princeton University and a chairman of the Council of Economic Advisers in the Obama administration who examined agreements for 40 of the nation's largest fast-food companies.

The provisions, he said, were "ubiquitous" among the companies and appeared to exist mainly to limit both competition and turnover, which can keep labor costs low.

The restrictions are different from what are known as noncompete agreements — clauses in employee contracts that keep an employee from jumping to a rival. Such agreements are typically described as a means of preventing employees from bringing trade secrets to a competitor.

"I think it's very hard to make the argument that noncompetitive agreements are necessary for low-educated, low-wage workers because they have trade secrets," Professor Krueger said. "This practice does have the potential to restrict competition and significantly influence pay."

The fast-food industry has been one of the biggest sources of job growth since the recession. More than 4.3 million people are now dipping fryer baskets and flipping hamburgers, a 28 percent increase since 2010 that is almost double the increase in the overall labor market, according to the most recent data from the Bureau of Labor Statistics.



Workers, many of them employees of fast-food outlets, rallied in New York in April 2015 in favor of raising the minimum wage to $15 an hour.  Spencer Platt/Getty Images

But the average fast-food worker takes home just $300 a week before taxes, about a third of what the average private sector worker earns.

Other industries also forbid franchisees from hiring one another's workers. The practice is more common when turnover rates are high, according to research by Professor Krueger and Orley C. Ashenfelter, who is also a professor at Princeton and, like Professor Krueger, a well-known labor economist. Health and fitness companies like Curves or Anytime Fitness, and maintenance services like Jiffy Lube have similar rules.

Representatives for Curves and Jiffy Lube did not respond to requests for comment. A spokesman for Anytime Fitness said in an email that employees "frequently move from one gym to another when professional growth opportunities arise and it has not created undue challenges or resentment" among its franchisees.

Professor Krueger and Professor Ashenfelter examined 156 companies in 21 industries, selecting businesses with more than 500 franchise stores in the United States. More than

Case 2:18-cv-13207-VAR-DRG   ECF No. 1-6, PageID.80   Filed 10/15/18   Page 5 of 9

half of the companies imposed some kind of restriction, according to their 2016 franchise disclosure documents, an annual financial filing.

The policies were most common in the fast-food industry: Of the 40 such companies covered in the report, 32 imposed some kind of hiring restriction, including Burger King, Domino's and Pizza Hut. Workers were often not allowed to take new positions without their bosses' written permission. (Several of the companies surveyed restricted only hiring between franchiser and franchisee.)

Domino's declined to comment. Burger King and Pizza Hut did not respond to requests for comment.

The report's tally also included McDonald's, which for at least 30 years had prohibited franchisees from hiring one another's workers. That changed in March, a spokeswoman said, when the company informed the owners of its more than 11,000 franchise locations that it would no longer enforce the rule.

Leinani Deslandes is the lead plaintiff in a lawsuit against McDonald's over the no-hiring provision, which the company stopped enforcing this year.  Edward Linsmier for The New York Times

The rules have attracted more scrutiny as a result of the two suits challenging their legality.

The McDonald's spokeswoman, Andrea Abate, said in an email, "We are confident that the terms of our franchise agreements, past and present, are appropriate and legal."

McDonald's abandoned the rule a month after CKE was sued over its version of the provision. But several fast-food experts said the timing could be coincidental because restaurant companies often try to distance themselves from their franchisees to avoid joint liability if the franchisees are sued.

The suit against McDonald's was filed later on behalf of an employee who worked at a franchise in Apopka, Fla., during the time when the rule was in effect.

Andrew Puzder, the former CKE chief executive who was President Trump's original pick for labor secretary, once told Congress that franchisees are "not a division, subsidiary or alter ego of CKE, but are truly independent small businessmen and businesswoman."

The lawyers suing McDonald's and CKE are trying to use the distinction Mr. Puzder made against the companies, arguing that these separate companies within one brand are signing illegal anti-competitive agreements with one another. The lawyers in the CKE case have cited guidance issued by federal officials in October that indicated it was against the law to, among other things, "refuse to solicit or hire" other companies' employees.

"They're either going to have to say, 'We are separate from our franchisees,' or 'We're one integrated entity,'" said Michael Rubin, a lawyer for former McDonald's workers who are suing the company separately over accusations of wage violations.

A photo of Ms. Deslandes, 29, at work. She said she thought was on track for a promotion and imagined that she might one day own her own franchise. "That's why I stayed so long," she said.
Edward Linsmier for The New York Times

An email sent to Mr. Puzder through his personal website was not answered. He withdrew as Mr. Trump's labor secretary nominee in March in the face of Democratic opposition to his positions on work force issues, and after it emerged that he had employed a housekeeper who was not in the United States legally.

The suits against CKE and McDonald's, filed in Los Angeles Superior Court and Illinois District Court, seek class-action status on behalf of tens of thousands of workers like Leinani Deslandes, the plaintiff in the case against McDonald's. She worked at a McDonald's in Apopka, Fla., from 2009 to 2016.

In a recent interview at a Panera Bread in Altamonte Springs, Fla., she described her employment experience at McDonald's and the reasons for the suit.

When her shift as a manager ran so late that she missed the last bus home, Ms. Deslandes said, she would walk the five miles home thinking about the next day's tasks — getting her children ready for school and helping her husband get off to work on time — and daydreaming about what she wanted for her own life: a smartphone that could play music

as she walked, or, better yet, a car.

She said she thought she was on track for a promotion, and imagined that one day she might own her own franchise.

"Somebody that could be doing your fries tomorrow, in 10 years, they could be running six or seven McDonald's," Ms. Deslandes said. "That's why I stayed so long."

Ms. Deslandes husband, Brian, and children, from left, Levi, Lilly and Layla. When Ms. Deslandes was not promoted at one McDonald's, she tried to move to another, but was blocked by the no-hiring rule.   Edward Linsmier for The New York Times

She was promoted to department manager, she said, and the next step would have been for her to fly to Illinois to attend "Hamburger University," where McDonald's runs its management-training programs. But the training was canceled when she got pregnant, she said in her suit, and the promotion never came.

She was frustrated, she said, and tried to take a job at a different McDonald's, but was blocked because of the no-hiring rule. "That's what hurt the most," she said.

Ms. Abate, the McDonald's spokeswoman, said the company disputed the accusations in the suit, but declined to answer specific questions about it.

Representatives for the franchisee of the outlet where Ms. Deslandes worked, Bam-B Enterprises, declined to comment on the details of her suit. Bam-B is not named as a defendant in the case.

Turnover rates are high in the industry, and maintaining a talented work force requires investing in training and recruitment. Prohibiting franchisees from hiring one another's workers protects that investment, said Stuart Hershman, a lawyer with the firm DLA Piper. He estimated that he had drafted hundreds of franchise agreements, many of which contained some kind of recruitment prohibition.

"There has never been, ever, any intention, by drafting this type of provision, to restrict employee mobility, restrict wage competition, or suppress employee pay," Mr. Hershman said.

There is no good measure for how often workers are restricted from changing jobs, and some franchisees interviewed by The New York Times were not aware that their ability to hire was restricted. It is also difficult to gauge what impact the hiring rule has on wages. But the prevalence of no-hiring agreements in franchise contracts suggests that "many employers do try to combine to restrict competition in the labor market," Professor Krueger and Professor Ashenfelter wrote.

"It might help explain a recent puzzle in the U.S. job market," the two wrote in their report. "Unemployment has reached a 16-year low and job openings are at an all-time high, yet wage growth has remained surprisingly sluggish."

*Robert Gebeloff and Jessica Silver-Greenberg contributed reporting from New York.*

A version of this article appears in print on Sept. 27, 2017, on Page B1 of the New York edition with the headline: Trapped in Fast Food's Slow Lane